Chris D. Barski (024321)
**BARSKI LAW PLC**
9332 N. 95th Way, Suite 109
Scottsdale, AZ 85258
(602) 441-4700
cbarski@barskilaw.com
*Counsel for Clean Bottling*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 7 |
| ALKALINE 88, LLC, | Case No. 2:23-bk-08867-MCW |
| Debtor. | **OBJECTION TO TRUSTEES MOTION TO APPROVE SETTLEMENT AGREEMENT** |

Clean Bottling Inc., through undersigned counsel, submits the following objection to the Chapter 7 Trustee's Motion to Approve Settlement Agreement Pursuant to Rule 9019 Between Trustee and eCapital Healthcare Corp. ("Motion"). Specifically, the Trustee has failed to acknowledge the mandatory buyout rights in the Licensing Agreement, Section 10.4(b). The following Memorandum of Points and Authorities include a comprehensive itemization of the issues before the Court on the brand rights and incorporate the facts set forth in the Objection to Motion to Abandon and the Motion to Dismiss Adversary Proceeding in 2:24-ap-00233-MCW.

**MEMORANDUM OF POINTS AND AUTHORITIES**

1. Clean Bottling entered into an Exclusive Licensing, Co-Packing and Distribution Agreement dated October 17, 2023 ("CB Licensing Agreement").
2. The CB Licensing Agreement was premised on the use of Debtor's equipment at various locations for purpose of distribution. At the time of the Licensing Agreement, Debtor was covering the cost of servicing and maintaining these machines and equipment used for bottling and distribution.

3. Prior to this, the Debtor had not been distributing any product since March 2023. From March 2023 through the date of the Agreement, there was no product being sold and Debtor had lost all of their accounts. The reality was that the Debtor received a windfall in maneuvering the Licensee to provide its resources to maintain the life of the brand and Clean Bottling provided a remarkable turnaround for a brand for a struggling brand.

4. The CB Licensing Agreement was entered into by buying out a previous Licensing Agreement between the Debtor and A1 Group.

5. On or about October 2, 2023, Clean Bottling entered into a Memorandum of Understanding ("MOU") with Joel Natario and A1 Group whereby Clean Bottling would "purchase the licensing agreement between A1 Group, Inc. and Alkaline88 Water Company, Inc. (the "LICENSE AGREEMENT") for a total cost of five hundred US Dollars ($500,000.00)." **Exhibit "A".**

6. Upon information and belief, the A1 License Agreement gave A1 Group the right to purchase equipment of the Debtor and A1 Group was purported to have purchased the equipment as of September 1, 2023. *See, e.g.*, Exhs. A-B of Motion to Abandon [DE 166].

7. Following the MOU, Clean Bottling purchased the A1 Licensing Agreement and entered into a nearly identical Licensing Agreement with the Debtor. **Exh. "B"**, Licensing, Co-Packing and Distribution Agreement ("CB Licensing Agreement").

8. As part of this transaction, the A1 Licensing Agreement was terminated by agreement dated October 17, 2023. **Exhibit "C"**, Termination of Licensing, Co-Packing and Distribution Agreement.

9. Clean Bottling paid A1 Group and Mr. Natario $450,000 via wire on October 19, 2023. Clean Bottling paid NASDAQ $20,000 on October 18, 2023 on behalf of A1 Group. Clean Bottling also made a final payment of $30,000 via cashiers check to A1 Group and Mr. Natario for its rights for a total of $500,000.

10. Clean Bottling further paid A1 Group and Mr. Natario $200,000 on October 20, 2023 as reimbursement for the licensing fee paid to Debtor for the October, 2023 monthly license fee.

11. Clean Bottling spent considerable funds to reestablish distribution of the brand.

12. An involuntary petition for bankruptcy proceedings was filed by petitioning creditors of the Debtor on December 11, 2023 and the Order for Relief was signed on January 24, 2024. [DE 8].

13. Pursuant to the CB License Agreement, Clean Bottling was finalizing the terms of buyout required under the CB License Agreement at the time the order for relief was entered in this case. The CB Licensing Agreement provides that in the event of default or insolvency of the Debtor, the brand and other assets <u>shall be</u> sold to Clean Bottling for $5,000,000 with monthly payments of $19,166.67. Section 10.4(b).

14. These communications are summarized in an email from David Guarino, Debtor's CFO, on February 1, 2024. **Exhibit "D"**. The email further discusses the terms of the equipment purchase which was premised on Clean Bottling's belief that the Debtor owned the equipment and/or that Clean Bottling owned Mr. Natario's right to the equipment under the buyout of the A1 Licensing Agreement.

15. Clean Bottling contends that the sale was finalized between the parties and this agreement must be honored by the Trustee. The Trustee has insisted on the more burdensome licensing payments and refused to honor the sale to Clean Bottling.

16. In addition, the Trustee sold the equipment to Mr. Natario upon the assumption that "A1 Group contends it is the rightful owner of the Debtor's machinery and equipment that is acquired under the Agreement and that the Debtor's significant amount of raw materials (bottles, caps, labels, etc.) in its co-packing plants across the country." See Motion to Approve Settlement, DE 109 at para. 9.

17. The Licensing Agreement licensed Debtor's trade secrets which were defined as "any all proprietary or other information used in connection with the manufacture, marketing, or sale of Licensed Products, including but not limited to <u>equipment,</u>

<u>processes, procedures,</u> recipes, ingredient lists, supplier information, customer information, and other information of commercial value to Licensor." The estate sold the trade secrets to A1 Group and breached the contract.

18. The issues leading to the default of Joel Natario with the estate were comparable to the issues that have befallen Clean Bottling. See DE 109 at para. 7 ("A1 Group claims it should have received 2.2M from the Debtor's sales in September 2023, however, A1 Group contends that these funds were paid to Debtor and then taken by creditors of the Debtor under deposit account control agreements."). The Trustee has also acknowledged "significant apparent misrepresentations made by the Debtor under the Agreement." *Id.* Despite these identical issues that have similarly impacted Clean Bottling, the Trustee sold the equipment to Mr. Natario while simultaneously refusing to honor the buyout provision with Clean Bottling under the CB License Agreement.

19. The Debtor is required to "indemnify, defend, and hold harmless Licensee" from these infringements of their trade secrets under Section 8.1. Debtor has not done so.

20. A1 Group aka Joel Natario has since sold the equipment to third party manufacturers who have since increased prices on Clean Bottling which has impaired profit margins and limited Clean Bottling's ability to maintain payments under the Licensing Agreement.

21. As a result of third party manufacturers using estate equipment to manufacture and market competing brands, the increased costs due to the Debtor not paying for maintenance from the licensing payments, and distributors offsets for prepetition obligations of the Debtor, Clean Bottling's revenue from the Licensing Agreement has significantly decreased.

22. Clean Bottling has demanded mediation to the adversary proceeding related to the CB Licensing Agreement which must be honored by the Trustee before any sale or settlement can be pursued.

23. The Trustee asserts in the Motion to Approve that the "Settlement Agreement will further save the estate of the cost, delay, uncertainty and inconvenience of litigation." Clean Bottling disagrees with this assertion and believes that the sale without regards to the rights of Clean Bottling under the CB License Agreement will actually increase the costs and complexity of the dispute to be resolve in the adversary proceeding and final administration of the estate. The Trustee has provided no assessment of the alleged cost savings of administration of the Surcharge Agreement versus anticipated costs of the increased complexity of the litigation with Clean Bottling which give rise to considerable claims against the estate. The Trustee further contends that the possibility of breach of the Surcharge Agreement remains high. The Trustee has not disclosed the regular monthly installments due under the eCapital loan, including arrears, such that there is inadequate information for the Court and interested parties to assess whether Clean Bottling can service the eCapital loan with the monthly buyout amounts or an increased amount which would may benefit the estate.

24. The settlement is also silent on whether eCapital is assuming the potential liabilities of the estate, including the significant misrepresentations of the Debtor comparable to those asserted by Mr. Natario and previously recognized by the Trustee. This is important because the Trustee asserts that the $250,000 will be available to unsecured creditors. Clean Bottling anticipates asserting claims against the estate in excess of that amount and the potential for recovery may leave the Chapter 7 estate insolvent. If eCapital is assuming the misrepresentation and fraud claims, that needs to be specifically set out for interested parties to make an informed decision.

25. The "settlement" is also silent on whether eCapital is taking the brand subject to the Licensing Agreement. This needs to be identified more specifically in any settlement or sale.

26. The Settlement Agreement attached as Exhibit A to the Trustee's Motion to Approve does not identify any claims that the estate may have against eCapital. As such, there can be no record that a release of unknown claims by the Settling Party has value.

27. The "settlement" is in reality a purchase by the Settling Party of estate property. As such, it should be subject to higher and better bids. Clean Bottling is prepared to bid more than the $250,000 to be distributed to unsecured creditors.
28. The disposition of property of the estate by way of "compromise" of a claim is the sale of intangible property which implicates Section 363. *In re Martin*, 91 F.3d 389, 394-95 (3rd Cir. 1996).
29. The Trustee's duty as a fiduciary is to maximize the assets of the estate which trumps potential settlements. Clean Bottling contends that it is likely that a settlement with Clean Bottling, potentially achieved through a mediation, in the related adversary proceeding will achieve a more attractive solution than what the trustee has negotiated. *In re Mickey Thompson*, 292 B.R. 415 (9th Cir. BAP 2003) (interested parties must be given the chance to overbid any settlements reached by the trustee and another creditor). Because the Trustee has not complied with the mediation provision which is a condition precedent to litigation, it cannot attest to this Court as to the *Woodson* factors.
30. Functionally, there is no settlement at all and the trustee is seeking to sell estate assets and impair Clean Bottling's rights to the brand and the potential for future resolution.
31. Clean Bottling spent considerable funds to re-establish distribution and placement with retailers. Clean Bottling saved the brand which was on the verge of losing all brand recognition prior to the Licensing Agreement.
32. Further complicating issues is that eCapital's last superseding UCC attached to their proof of claim does not specifically identify intellectual property or brand rights as collateral. It is questionable whether eCapital has a validly perfected lien with the vague superseding UCC filing. At the time of executing the CB Licensing Agreement, Clean Bottling was never informed of any security interest in the brand rights. This was material to the transaction and it was never disclosed that they were acquiring the brand rights subject to an alleged security interest that was likely in default.

Case 2:23-bk-08867-MCW    Doc 201    Filed 12/27/24    Entered 12/27/24 18:26:44    Desc
Main Document    6    Page 6 of 8

33. Clean Bottling has filed to compel mediation in the adversary proceeding. See 2:24-bk-00233, DE 6. The rights to the brand and resolution of ongoing payments will be crucial to revolving that dispute. In its Response, the Trustee requested that the Defendant properly join (presumably third parties), which may include eCapital to seek a global resolution. Clean Bottling does not disagree that would be practical but the inclusion of third parties in a potential mediation is unlikely if the sale is approved.

34. The totality of these complexities make a showing under the *Woodson* factors virtually uncertain and premature given the nature of the outstanding issues and litigation. At a minimum, the Court should defer any ruling contingent upon Clean Bottling's mandatory buyout rights and the default allegations to be resolved in the pending adversary proceeding, which includes mandatory mediation.

WHEREFORE, Clean Bottling requests that the Court deny the Trustee's Motion to Approve.

DATED this 27th day of December, 2024.

**BARSKI LAW PLC**

By /s/ Chris Barski – 024321
Chris Barski
*Attorney for Clean Bottling Inc.*

ORIGINAL of the foregoing electronically filed this 27th day of December, 2024, with:

Clerk of the United States Bankruptcy Court
District of Arizona
230 North First Avenue, Suite 101
Phoenix, AZ 85003-1706
https://ecf.azb.uscourts.gov

COPY of the foregoing e-mailed this same date, to:

Ryan W. Anderson
BURCH & CRACCHIOLO, P.A.
1850 NORTH CENTRAL AVENUE
SUITE 1700
PHOENIX, AZ 85004

randerson@bcattorneys.com
*Attorney for Trustee*

By: /s/ Danae Romero